**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIM. NO. 09-568** |
| | : | |
| **GREGORY GRISWOLD** | : | |

---

**Diamond, J.**                                                                                    **July 20, 2010**

<u>**MEMORANDUM**</u>

In September 2008, the U.S. Probation Office received an anonymous letter stating that Defendant Gregory Griswold – then on supervised release for firearms offenses – possessed a semi-automatic handgun.  Acting on this tip, Defendant's Probation Officer, with the assistance of United States Marshals, searched Defendant's apartment and recovered a semi-automatic handgun, ammunition, and two knives.  Defendant made a statement regarding the gun during the search and another statement some six hours later when questioned by Marshals at the Federal Courthouse.

After he was charged with possession of a firearm by a convicted felon,  Defendant moved to suppress the physical evidence and his statements.  *(Doc. Nos. 19, 28.)*  <u>See</u> 18 U.S.C. § 922(g)(1).   On March 11, 2010, I held an evidentiary hearing and took the matter under advisement pending the submission of proposed factual findings and legal conclusions.  The Parties have now fully briefed the matter.  *(Doc. Nos. 36, 43, 46, 47.)*

I will deny the Motions with respect to the physical evidence and the statement Defendant made at the Courthouse.  I will grant the Motions with respect to the statement

Defendant made during the search. Pursuant to Fed. R. Crim. P. 12(d), I make the following factual findings and legal conclusions.

### FINDINGS OF FACT

At the suppression hearing, the Government called Probation Officers Adam Peterson and Thomas Miles and Deputy Marshals James Carroll and Daniel Donnelly. The Government also introduced photographic and documentary evidence. Defendant presented no evidence. I credit the testimony of the Officers and the Marshals, and I find that the Government has proven the following facts by a preponderance of the evidence.

### <u>Defendant's Prior Federal Conviction</u>

On May 16, 1994, Defendant pled guilty before the late Honorable Herbert Hutton to seven counts of making false statements to a licensed dealer in connection with the acquisition of a firearm and one count of felon in possession of a firearm. *Crim. No. 94-83; Gov. Ex. 1.* <u>See</u> 18 U.S.C. § 922(g). Using four aliases, Defendant had illegally purchased seven semi-automatic handguns, two of which were hidden in his residence. *Crim. No. 94-83, PSR ¶¶ 5-8.* At the time of his guilty plea, Defendant's criminal history included 1985 convictions for third degree murder by shooting and possession of an instrument of a crime, two 1986 firearms convictions, and two 1987 drug convictions. *Id. at 9-13.* Under the then-mandatory Sentencing Guidelines, Defendant's criminal history designation was at the second highest level -- V. *Gov. Ex. 9; 3/11/10 Tr. at 36:1-2,38, 69, 70.* On September 27, 1994, Judge Hutton sentenced Defendant to a top-end Guidelines sentence of forty-six months imprisonment to be followed by three years of supervised release. *3/11/10 Tr. at 71:5; Crim. No. 94-83, Doc. No. 32.*

Among the standard conditions of Defendant's supervised release were the following:

> The defendant shall not possess a firearm or destructive device.
> The defendant shall not leave the judicial district without the permission of the court or probation officer.
> The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.

*Crim No. 94-83, Doc. No. 33.* See U.S.S.G. § 5D1.3(c)(10). Probation was thus authorized to conduct scheduled and unscheduled visits to Defendant's home and office and seize plain-view contraband, including firearms. *3/11/10 Tr. at 11:12-15, 29:12, 44:6.* See United States v. Reyes, 283 F.3d 446, 471 (2d Cir. 2002) ("[A] probation officer legally may seize contraband observed in plain view during a home visit . . . .").

After completing parole in an unrelated state matter, Defendant began his term of federal supervised release "in late 2006." *3/11/10 Tr. at 12:1-4.* In December 2006, Defendant's case was reassigned to the Honorable Harvey Bartle. *Crim. No. 94-83; Doc. No. 43.*

**Defendant's Supervised Release**

In June 2008, Adam Peterson joined the U.S. Probation Office after working as "an investigator for the Office of Inspector General in Pennsylvania for approximately a year and a half and prior to that . . . [as] a County Probation Officer in Philadelphia for about five and a half years." *3/11/10 Tr. at 3:20-23.* On June 30, 2008, Peterson assumed Defendant's supervision from Probation Officer George Reed. Peterson had learned from Reed that Defendant's was a "case of concern," and that Reed had designated Defendant a "special offender" because of his "lengthy criminal history related to firearms . . . [his] conviction for homicide . . . and his likelihood of recidivism . . . ." *Id. 9:6-22.*

Reed told Peterson that on June 11, 2008, a woman who did not identify herself had called the Pennsylvania Parole Office and said that Defendant had a gun in his apartment. *Id. at 9:10-12, 40:16-19.* The Parole Office reported the call to Reed, who unsuccessfully sought corroboration from local police before transferring Defendant's case to Peterson. *Id. at 9:8-14, 40:21-24.* Although Peterson continued these efforts, local and state police could not corroborate that Defendant had a gun. *Id. at 42-43, 44:12-15, 68:21-24.* Peterson also made "some random visits to [Defendant's] employment . . . where [he] just kind of sat across the street to see if [he] saw anything unusual." *Id. at 44:6-10.* Peterson conducted "some random home visits as well," but saw no gun. *Id.* On July 30, 2008, Chief Judge Bartle denied Defendant's request for early termination of supervision. *Crim. No. 94-83, Doc. No. 47.*

**The Anonymous Letter**

On September 12, 2008, Peterson "received a phone call from Chief Judge Bartle . . . advis[ing] [him] that [the Judge] was in receipt of an anonymous letter from a concerned citizen" regarding Defendant. *Id. at 12:17-20.* On September 15th, Judge Bartle provided Peterson with the letter which stated:

> In reference to Gregory Griswold
> Docket # 94-0083-01
>
> To whom this may concern. Im writing to thank you for not granting Gregory Griswold a early supervised release. He still live the life of a criminal all though he has a parole officer. He is still on parole. Gregory does not work for IQraa deli he was cell mates with the owner years ago and when they new Gregory was being released the owner made up foney paper work for him and he was allowed to put a stand infront of there store. Gregory has a 9mm Gun that he carry around and he also drives a car every day of the week.
> He has some one who he buys counter fit $20 bills from and he goes out of the city limits every Saturday. Gregory is still living as a

criminal. How close are you watching your parolee and he is allowed to walk the streets with a gun, knife and mase daily.

How can his release be supervised if he's out of the city at least twice weekly without your permission.

Thank You
A concerned citizen.

*Gov. Ex. 2; 3/11/10 Tr. at 47:21.*

Peterson was struck by the letter's detail and accuracy. *Id. at 13:22-25,14:1-9.* For instance, the author described the gun's caliber, knew that Defendant was on supervised release, and knew of Judge Bartle's recent denial of Defendant's request for early termination of supervision. *Id.* The author also knew that Defendant worked at a stand near "a deli," and "that he does travel outside the city. . . ." *Id.* Indeed, as required by the standard conditions of his release, Defendant had sought permission from Probation to make these worked-related trips. *Id. at 14:6-9.* The author had also correctly identified "the docket number for Mr. Griswold's case." *Id. at 14:3,20.*

Peterson "wanted to act appropriately to protect the community if there was anything going on." *Id. at 15:7-15.* Accordingly, "when [he] received the phone call from Judge Bartle [he] obviously advised his supervisor, Sally Keglovits about the situation . . . [and] reviewed the letter with her in her office." *Id. at 15:1-5.*

Most of the investigative tips received by Probation are anonymous. *Id. at 80:12-13.* Because Probation "receive[s] a lot of bad information as well [as reliable information, the Officers] try to filter through as much as [they] can, try to corroborate as much as [they] can . . . through documentation, collateral contact with law enforcement, neighbors, things of that nature." *Id. at 7:9-16.* As Officer Miles testified, "we can't take this stuff lightly . . . we would

never ever blow off something like that." *Id.* *at 78:7, 81:15-16.* On the contrary, Peterson thought the suggestion that Defendant had a gun "might have some credence." *Id.* *at 17:19.* Peterson was especially concerned that Probation had received two such tips in three months. *Id.* *at 17:22-25.* Moreover, Peterson knew that Defendant had been convicted of a shooting murder and many weapons offenses, and that Defendant was on supervised release after having pled guilty to purchasing illegally seven semi-automatic handguns and "possession of a firearm by a convicted felon." *Id.* *at 9:25, 19:23-25, 20:1-3, 23:8.*

Peterson also knew that Defendant "operated a vending business" requiring him to "carry cash." *Id.* *at 18: 13-19.* "[T]hrough [his] contact with Mr. Griswold [Peterson believed] that he wouldn't be without a firearm, that he regularly would carry a firearm based on his criminal history [and] based on what he did for a living." *Id.* *at 18: 7-11.*

### The Petition/Warrant to Search

Peterson and Keglovits "talked about [the anonymous letter] at length and [] reviewed the file." *Id.* *at 20:6-7.* Peterson believed that if Defendant had a gun in his residence, an unscheduled visit – allowed as a standard condition of supervised release – would not ensure the weapon's recovery because during home visits

> we're not authorized to open drawers and closets and things of that nature and we're only authorized to seize things in plain view *unless we seek the Court's authorization to do otherwise.*

*Id.* *at 7:17-20 (emphasis added).* Accordingly, at the direction of Keglovits, Peterson prepared "a petition to modify the conditions of supervised release" to allow Probation to search Defendant's residence. *Id.* *at 7:24-25.* Peterson called Judge Bartle to "let him know that [he

was] inclined to seek the Court's authorization for a search and seizure warrant of Mr. Griswold's residence, person and vehicle." *Id. at 20:12-15.*

Peterson drafted a petition in the form the Probation Department customarily uses in this District to seek the modification of supervised release conditions. *Id. at 22:10-13.* Judge Bartle told Peterson to include "a synopsis of what [they] had discussed on the phone. . . ." *Id. at 21:18-22.* Finally, Judge Bartle told Peterson that only reasonable suspicion was required to search Defendant's home. *Id. at 22:8.*

Peterson drafted the Petition and submitted it for Judge Bartle's review and approval on September 16, 2008. *Id. at 51:15-17, 82:8.* The Petition included the following synopsis:

> In June 2008, the U.S. Probation Office was notified that an anonymous phone call had been placed to the Pennsylvania State Parole Office, stating that the defendant had a firearm in his residence. Additionally, the Court was recently advised through an anonymous letter that the defendant is in possession of an illegal firearm and is involved in various other criminal activities. The aforementioned letter provided detail as to what type of firearm (9 millimeter) the defendant is in possession of, and stated that Mr. Griswold carries this firearm on his person. The defendant has an extensive criminal history in Pennsylvania related to possession of illegal firearms. The defendant was convicted of third-degree murder in 1980 involving a handgun. It is also noted that the defendant's instant offense is related to the illegal acquisition and possession of firearms.

*Gov. Ex. 3.* In its Petition, Probation sought authorization for: 1) a search – to be conducted no later than September 30, 2008 – of Defendant's person, vehicle and residence; and 2) the "U.S. Marshals Service along with other law enforcement agencies" to assist in the search to ensure safety. *Id.; see also 3/11/10 Tr. at 25:23-25.* On September 17, 2008, Judge Bartle signed the Petition. *Gov. Ex. 3.*

Without Judge Bartle's approval, Probation would not have conducted the search. *3/11/10 Tr. at 35:11-15.* Peterson believed that once it was signed by Judge Bartle, the Petition

was a warrant authorizing the search of Defendant's residence, as did Keglovits, Officer Miles, and Marshal Carroll. *Id.* at 20:8, 33:5-9, 79:23-24, 105:21, 106:5. This was, however, the first such "search warrant" Peterson had sought since becoming a Probation Officer. *Id.* at 33:9. Indeed, Miles – a Probation Officer for almost twenty years – testified that "these search orders are rarely applied for or given." *Id.* at 81:6.

### The Search

Although Peterson wanted to conduct the search "as quickly as possible," it took him several days to coordinate with the Marshals Service. *Id.* at 51:10-14. "It was [Probation's] search," however; "the Marshals were there to assist" and ensure safety. *Id. at 73:23-25, 83:1, 105:21-22.* Probation and the Marshals decided to conduct the search during the early morning hours of September 25, 2008. *Id. at 25:13.* Miles was assigned to assist Peterson. *Id. at 27:6-14.* Accompanying Miles and Peterson were "more than a dozen" members of the Fugitive Task Force, comprised primarily of Marshals as well as personnel from the Pennsylvania State Police, the Philadelphia Police Department, the Pennsylvania Board of Probation and Parole, and other county police departments. *Id. at 53:6, 104:20-25.* Before conducting the search, the team was apprised of Defendant's "violent criminal past." *Id. at 106:3-7, 122:4-7.*

At approximately 6:30 a.m., the search team arrived at Defendant's Philadelphia apartment complex. *Id. at 107:8.* Eight team members – including Peterson and Miles – entered the complex, while "three officers [] watch[ed] outside just in case there was any attempt for escape." *Id. at 108:9-15.* Marshals knocked on Defendant's door and "said that they were maintenance." *Id. at 55:2, 107:9-10.* Defendant replied that he had to "put [his] pants on" before opening the door. *Id. at 56:7.* Through the door the team heard "metal clinking" coming

from the apartment and "assumed that [Defendant] was trying to put something out the window." *Id. at 56:9-22, 109:19-22.* The Marshals again knocked on Defendant's door, identified themselves properly, and ordered Defendant to let them in. *Id. at 56:17-25.* Still in his underwear, Defendant opened the door. *Id.*

When the search began, the team's "chief concern was safety." The first team member to enter the apartment held up a "ballistic shield" to protect him and the members lined up behind him. *Id. at 57:5-6, 109:5.* Wearing Kevlar vests that were "fully identified with markings" indicating "United States Marshals," the team entered Defendant's apartment: "every member had a gun drawn." *Id. at 125:6-7. Id. at 98:20, 125.* Defendant "was secured with handcuffs" and "brought . . . into a bathroom." *Id. at 111:17-19, 128:8-9.* Miles "was one of the last [team members] to enter the apartment." *Id. at 83:9-10.* Upon entering – "in the interests of [his] personal safety" – Miles "asked [Defendant] if there [was] a gun or where [was] the gun before [the team] conduct[ed] a search." *Id. at 83:23-25, 84:8-10.* Defendant answered, "There's no guns here." *Id. at 84:14.*

James Carroll – a 13-year veteran of the Marshals Service – "made entry into [Defendant's bedroom]" and conducted a quick protective sweep to "mak[e] sure that . . . there wasn't any danger." *Id. 112:4-10.* Although the ten by ten foot bedroom was at least partially illuminated by daylight, Carroll used the flashlight attached to his firearm to scan the room and "[saw] there was something dark behind" the "radiator right under the window." *Id. at 112:15-20, 133:1-2.* The radiator had "slats through the metal pipes . . . that would allow someone to see behind it to some extent." *Id. at 133:9-11.* Carroll approached the radiator, "flashed a light in there and looked and [] saw what looked to be a handgun, a black handgun that was wedged

down between the window and the radiator." *Id. at 112:17-21.* The gun was "within reaching distance . . . within a foot" of the top of the radiator. *Id. at 135:2-3.* Carroll announced that he had found a firearm and "called for one of the Federal Probation Officers to come over and take possession of it . . . ." *Id. at 113:4-13.*

Responding to Carroll, Miles "looked at the radiator and [saw] a black triangle." *Id. at 85:2-3.* The radiator had "a space of maybe six to eight, you know, maybe not even that, maybe four inches where [Miles] could look over it . . . ." *Id. at 86:12-18.* Miles looked down at the space between the radiator and the wall and saw the butt of a semi-automatic handgun. *Id. at 87:16-17.* Miles "safely removed the gun from the back of the radiator and [] emptied the weapon which had 13 rounds" of ammunition. *Id. at 87:19-23.* Defendant – who was in the bathroom several feet away – likely could hear the team find the gun in his bedroom. *Id. at 113:24-25, 114:1-2.*

Once again, Probation sought judicial permission to search Defendant's apartment because of Peterson's concern that he would not, during a home visit, find a hidden gun. *See id. at 7:17-20 ("[W]e're only authorized to seize things in plain view").* As Miles testified, however, given the gun's placement behind the bedroom radiator slats, the weapon "absolutely" would have been discovered upon a plain view inspection of the apartment "during the conducting of a home visit." *Id. at 87:3-9.*

Retrieving the gun within seconds of the team's entry into the apartment, Miles walked with "the gun in [his] right hand . . . toward the bathroom where [Defendant] and a number of the Marshals" waited. *Id. at 88:17-24.* Miles "looked at [Defendant] and [] just went 'Dude,' and . . . pointed to the gun." *Id.* In making this remark -- "Dude" -- Miles did not "plan[] to get

an admission that the gun was [Defendant's]," nor had Miles intended "any type of interrogation strategy." *Id. at 89:12-17.* Rather, Miles intended to "ask essentially" why Defendant "did [] not tell [Miles] there was a gun" in response to the question Miles had posed moments before. *Id. at 98:15-20.* Defendant responded to Miles "that the gun was his wife's and she was registered and authorized to carry a firearm . . . ." *Id. at 60:20-22.*

Probation Officer Miles received no training in constitutional law, Fifth Amendment requirements, or Miranda rights, and did not know when Probation "may or may not interrogate a suspect whose home [it is] searching." *Id. at 99-100.* Miles considered his conversation with Defendant -- begun with Miles' remark, "Dude" -- part of Defendant's supervision. *Id. at 101:20-101:02.*

Having recovered the gun, the team resumed the search and "looked through the residence to see if there was any additional contraband." *Id. at 61:17-18.* The team recovered gun enthusiast publications, gun catalogues, thirty-seven additional rounds of ammunition from an open duffle bag outside Defendant's bathroom, a "dagger type knife" that was in the team's plain view "on a table in [Defendant's] bedroom," and a folding knife in Defendant's closet. *Id. at 28:11-16, 31:13-25, 32:1-8, 62, 64, 138:19-22; see also Def. Ex. 1.*

**The Courthouse Interview**

During and after the search – which lasted approximately one hour – the Marshals did not speak with Defendant. *3/11/10 Tr. at 100:25, 115:6, 136:22-25, 137:3-5.* Once the search was completed, the Marshals told Defendant that they were "taking him down to the courthouse." *Id. at 114:25.* The Marshals and Peterson then "escorted [Defendant] out [of his apartment], brought him to the courthouse [] and had him booked" for a violation of supervised release. *Id.*

*at 115:1-2, 136:24-25.* The drive to the Federal Courthouse took approximately thirty minutes. *Id. at 116:9.* "Officer Miles wasn't present in the vehicle." *Id. at 65:19-20.* Defendant was not questioned during the drive. *Id. at 115:10-12.* There was no "discussion or any comments made towards [Defendant] while he was being transported to the courthouse," nor was there "any discussion amongst [the U.S. Marshals], amongst law enforcement or Probation Officers about the facts and circumstances of [Defendant's] case. . . ." *Id. at 139:11-18.*

Defendant arrived at the Courthouse around 9:00 a.m. *Id. at 116:12-14.* The Marshals "dropped [Defendant] off so he could be processed and given an in-custody search by [the] cellblock personnel [while] awaiting his court appearance." *Id. at 139:8-10.* At approximately 12:30 P.M., Carroll and Marshal Dan Donnelly (an eleven year veteran) "went into the cellblock and [took Defendant] to an interview room still in the in-custody part of the cellblock." *Gov. Ex. 7; 3/11/10 Tr. at 116:22-25:2-8.* Defendant "was not handcuffed at any time during the interview" with the Marshals. *Gov. Ex. 7.* Carroll and Donnelly gave Defendant an Advice of Rights Form, which provided as follows:

> **Your Rights**
> Before we ask you any questions, you must understand your rights.
> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer for advice before we ask you any questions.
> You have the right to have a lawyer with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
> I have read this statement of my rights and I understand what my rights are. At this time I am willing to answer questions without a lawyer present.
>
> Signed _____

*Gov. Ex. 6.* The two Marshals then read the Form to Defendant as he read along. *3/11/10 Tr. at 118:16-21.* Defendant understood his rights and chose to waive them, signing the Form in the presence of the Marshals. *Id. at 147:2-4.* Defendant then freely spoke with the Marshals about a variety of subjects. *Gov. Ex. 7; 3/11/10 Tr. at 143:1-10.* Neither Carroll nor Donnelly knew of Defendant's earlier statement, nor were they aware that Miles had made a remark ("Dude") to Defendant some six hours earlier. *3/11/10 Tr. at 119:16-23, 146:1-14.*

For "about twenty minutes" the Marshals interviewed Defendant, who admitted that the knives, gun publications, and gun catalogues recovered from the apartment were his. Defendant reiterated that the gun belonged to his wife, and said that "he did not know where the ammunition came from." *Id. at 119:15; Gov. Ex. 7.* During the interview, Defendant "was very cooperative [and] gave clear statements." *3/11/10 Tr. at 144:1-2.* Later that day, Carroll – with the assistance of Donnelly – wrote a summary of the Courthouse interview. *Gov. Ex. 7; 3/11/10 Tr. at 120:11-13.*

## CONCLUSIONS OF LAW

### I.  Motion to Suppress Physical Evidence

Defendant asks me to suppress the gun, ammunition, and knives, arguing that the search of his apartment was not supported by probable cause. In the alternative, Defendant argues that Probation did not have "reasonable suspicion" to conduct the search. I do not agree with either argument. Because Probation acted reasonably in the difficult circumstances presented, I conclude that Defendant's Fourth Amendment rights were not violated. <u>See</u> <u>Ohio v. Robinette</u>, 519 U.S. 33, 39 (1996) ("We have long held that the touchstone of the Fourth Amendment is

reasonableness.") (internal citations and quotation marks omitted). In the alternative, I conclude that even if the apartment search was somehow defective, exclusion of the evidence is unwarranted in light of Probation's good faith reliance on the judicially-approved petition/warrant.

### A. Legal Standards

Once a defendant moves to suppress, the Government must show by a preponderance of the evidence that it acted within the Constitution. United States v. Matlock, 415 U.S. 164, 177 n.14 (1974); United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). The Fourth Amendment usually requires that police have probable cause and a warrant before searching an individual's residence. United States v. King, 2010 U.S. App. LEXIS 2573, at *12 (3d Cir. Feb. 8, 2010). Those on federal supervised release -- like probationers and parolees -- have more limited rights, however. The Supreme Court has upheld warrantless searches authorized by state laws requiring less than probable cause to search the homes of probationers and parolees. See Samson v. California, 547 U.S. 843, 850 (2006); United States v. Knights, 534 U.S. 112, 121 (2001); Griffin v. Wisconsin, 483 U.S. 868, 874 (1987). The Court reasoned that probationers and parolees "have severely diminished expectations of privacy by virtue of their status alone." Samson, 547 U.S. at 850. Moreover, the supervision of such individuals presents "special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." Griffin, 483 U.S. at 874 (internal quotations omitted); see also Samson, 547 U.S. at 857 ("[T]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee . . . .").

Defendant argues that because "federal supervised release rules" "do not provide for warrantless searches as a standard condition of supervision," the reasoning of <u>Griffin</u>, <u>Knights</u>, and <u>Samson</u> does not apply here. *See Doc. No. 21.* Yet, Defendant acknowledges that "federal supervised release rules" authorize probation officers to conduct unannounced warrantless home visits and seize contraband in plain view. *(Doc. No. 21 at 4, 27 at 2.)* <u>See</u> U.S.S.G. §5D1.3(c)(10). Although less invasive than full searches, these visits certainly constitute Fourth Amendment intrusions. <u>Cf.</u> <u>United States v. LeBlanc</u>, 490 F.3d 361, 369 (5th Cir. 2007) ("[I]n supervising a probationer, a probation officer may have to take actions to accomplish a home visit that would intrude upon the liberty of an ordinary person . . . .") (citation omitted). Accordingly, the reduced Fourth Amendment rights that attach to parole or probation "apply *a fortiori* to federal supervised release . . . ." <u>United States v. Reyes</u>, 283 F.3d 446, 461 (2d Cir. 2002). The Third Circuit has explained that

> [i]ndividuals on supervised release, like individuals on probation [and parole], do not enjoy the absolute liberty to which every citizen is entitled. . . . [A]n individual on supervised release has a reduced right to privacy.

<u>United States v. Sczubelek</u>, 402 F.3d 175, 184 (3d Cir. 2005); <u>see also</u> <u>United States v. Baker</u>, 221 F.3d 438, 443 (3d. Cir. 2000) ("[A] parolee's car or home can be searched on the basis of reasonable suspicion alone, *even in the absence of an authorizing state statute such as that in Griffin*.") (emphasis added) (citation omitted); <u>United States v. Hill</u>, 967 F.2d 902, 909 (3d. Cir. 1992) ("We recognize that in <u>Griffin</u> the searches were conducted under a particular regulatory scheme and here no specific statutory or regulatory provision authorized [the defendant's] parole agents to conduct the warrantless search of his store. Nevertheless, we find the Court's reasoning germane.").

As the <u>Hill</u> Court persuasively observed, "[p]articularly where . . . guns are involved, it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon a showing of probable cause." 967 F.2d at 909 (internal citations and quotation marks omitted). Accordingly, like Judge Bartle, I conclude that Probation needed "reasonable suspicion alone" to search Defendant's apartment. See <u>Baker</u>, 221 F.3d at 443 ("It is reasonable to allow a parole officer to search whenever he reasonably believes that it is necessary to perform his duties. The decision to search must be based on 'specific facts,' but the officer need not possess probable cause.") (internal citations omitted).

### B.   The Search Was Supported by Reasonable Suspicion

In deciding if reasonable suspicion exists, I must "consider the totality of the circumstances to determine whether the officer has a particularized and objective basis for suspecting legal wrongdoing." <u>United States v. Williams</u>, 417 F.3d 373, 376 (3d Cir. 2005) (internal citations and quotation marks omitted). "Although an officer's reliance on a mere 'hunch' is insufficient . . . the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002) (internal citations and quotation marks omitted).

I must first determine whether the anonymous tips received by Probation were reliable. The Third Circuit has identified five criteria to aid in making this determination:

(1) whether the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility;
(2) whether the informant can be held responsible if her allegations are untrue;
(3) whether the information would not be available to the ordinary observer;

(4) whether the informant has recently witnessed the criminal activity at issue; and
(5) whether the witness's information accurately predicts future activity.

United States v. Johnson, 592 F.3d 442, 449 (3d Cir. 2010) (citing United States v. Torres, 534 F.3d 207, 211 (3d Cir. 2008)). Although "these factors all are relevant . . . no single factor is dispositive *or even necessary* to render an informant's tip reliable." Johnson, 592 F.3d at 449 (emphasis added) (citation omitted); see also Torres, 534 F.3d at 213 ("[A] tip need not bear all of the indicia – or even any particular indicium – to supply reasonable suspicion."). The June 11th phone call meets none of these criteria. The letter to Judge Bartle meets only one: some of the information in the letter "would not be available to the ordinary observer." The letter's author knew that Defendant purportedly worked at a stand near "a deli," and knew that Defendant frequently traveled outside Philadelphia. The author also knew the docket number of Defendant's criminal matter before Judge Bartle, that Defendant was on supervised release, and that Judge Bartle had recently denied Defendant's request for early termination of supervision. Although not numerous, "the details provided in the tip were sufficiently particularized and accurate to reflect a 'special familiarity' with the subject of the information." United States v. Nelson, 284 F.3d 472, 483-484 (3d Cir. 2002) (citing Ala. v. White, 496 U.S. 325 (U.S. 1990)).

In disputing the letter's reliability, Defendant argues primarily that it included no predictive information. *See Doc. No. 36 at 14.* The Third Circuit has held, however, that an anonymous tip may be credible even if it does not include predictive information. See Nelson, 284 F.3d at 483-484 ("The tipster did not need to know [the defendant's] future behavior in order to demonstrate the sort of inside information that connoted the caller's familiarity with the conduct being reported."); see also United States v. Torres, 534 F.3d 207, 213 (3d Cir. 2008)

("[T]he need for predictive information is not required where an officer had objective reason to believe that a tip had some particular indicia of reliability.")

In these circumstances, the anonymous June 11th phone tip that Defendant had a gun, taken alone, was not reliable. The anonymous letter, however -- especially when considered together with the June 11th phone call -- was amply reliable.

Of course, "the reliability of a tip . . . is not all that we must consider in evaluating reasonable suspicion; the content of the tip must also be taken into account, as well as other surrounding circumstances." United States v. Valentine, 232 F.3d 350, 355 (3d Cir. 2000); see also White, 496 U.S. at 330 (even a tip with a "relatively low degree of reliability" can support a finding of reasonable suspicion where "more information . . . establish[es] the requisite quantum of suspicion"). Here, Peterson had supervised Defendant for some three months and knew of Defendant's criminal history involving firearms, including a murder conviction. See Griffin, 483 U.S. at 879 (a probation officer "must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances"); United States v. Henry, 360 Fed. Appx. 395, 398 (3d Cir. 2010) ("[I]nformation regarding possible parole violations, combined with [parole officer's] knowledge of [a parolee's] own prior criminal history . . . [and] experience as a parole agent, clearly furnished reasonable suspicion . . . ."); United States v. Simpson, 2010 U.S. App. LEXIS 13151, *20 (10th Cir. June 28, 2010) ("In conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus.") (internal citations omitted).

Because probation officers must be able "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information

available to them that might well elude an untrained person," I conclude that Probation had reasonable suspicion on which to base its search of Defendant's apartment. <u>Arvizu</u>, 534 U.S. at 273 (internal quotation marks omitted). Because the search of Defendant's apartment was thus permissible, I will not suppress the firearm, knives, or ammunition.

### C.     Probation's Good Faith

Over twenty-five years ago, the Supreme Court held that suppression "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority," even if the warrant is later deemed inadequate. <u>United States v. Williams</u>, 3 F.3d 69, 74 (3d Cir. 1993) (citing <u>United State v. Leon</u>, 468 U.S. 897, 919-22 (1984)). The Supreme Court recently explained that

> [t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

<u>Herring v. United States</u>, 129 S. Ct. 695, 702 (2009). Accordingly, if a search warrant is ruled defective after it is executed, suppressing the evidence seized will not deter police misconduct if the police reasonably believed that the warrant was lawful. <u>See</u> <u>United States v. Thatcher</u>, 1993 U.S. App. LEXIS 23438, at *10 (7th Cir. Sept. 8, 1993) (the exclusionary rule is designed to "deter future violations by police officers"); <u>United States v. Eisen</u>, 1990 U.S. Dist. LEXIS 14219, at *35 (E.D.N.Y. Oct. 19, 1990) ("Where excluding evidence will not serve this deterrent purpose, there is no reason to suppress it under . . . the exclusionary rule.").

The Third Circuit has held that "[t]he test for whether the good faith exception [to the exclusionary rule] applies is whether a reasonably well trained officer would have known that

the search was illegal, despite the [judge's] authorization." United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999) (citing Leon, 468 U.S. at 922). Under this test, Probation's good faith in the instant matter is manifest. It is undisputed that Peterson and Miles could properly have visited Defendant's apartment unannounced and seized plain view contraband -- which, as I have found, would have included the gun and dagger recovered on September 25, 2008. Moreover, the facts and circumstances known to Peterson would have allowed Probation to search Defendant's apartment without first obtaining a warrant. In an abundance of caution, however, Probation instead sought authorization from Judge Bartle before conducting any search.

I agree with Judge Bartle that Probation needed only reasonable suspicion to conduct the search, and that the two tips combined with the totality of facts and circumstances provided reasonable suspicion. In the alternative, however, I conclude that even if the search was somehow defective, "the extreme sanction of exclusion" is not warranted. Leon, 468 U.S. at 916. Rather, the Probation Officers "acted in good faith reliance on a facially valid . . . order issued by a United States District Court." Gluck v. United States, 771 F.2d 750, 758 (3d Cir. 1985). Allowing the evidence they recovered to be presented at trial "[would] not offend the integrity of the judicial process." Id. Moreover, excluding the evidence would not "deter future misconduct by [Probation]" because no misconduct took place. Id. On the contrary, excluding the evidence would serve only to discourage thoughtful efforts -- like those undertaken by Peterson and Miles -- to supervise effectively and within the law.

## II.    Motion to Suppress Statements

Defendant made three statements to authorities on September 25, 2008: (1) his initial denial that there were any guns in the apartment; (2) his response to Miles' remark "Dude"; and

(3) the statement he gave to the Marshals at the Courthouse. Defendant does not seek suppression of the first statement. Rather, he argues that the second statement was impermissibly obtained in violation of Miranda and tainted the third statement.

I agree that the second statement must be excluded, but I will not suppress the third.

### A. Legal Standards

The Government "must prove by a preponderance of the evidence that [a suspect's statements] . . . w[ere] voluntary." Nix v. Williams, 467 U.S. 431, 444 n. 5 (1984). A statement is voluntary if the suspect knowingly and intelligently waives his rights after police properly advise him or her as required by Miranda. See United States v. Tyler, 164 F.3d 150, 158 (3d Cir. 1998). Police must thus inform the suspect that: (1) he has the right to remain silent; (2) the government may use any statement he makes against him; (3) he has the right to advice of counsel; (4) he will be provided with a lawyer if he cannot afford one; and (5) if he chooses to make any statement, he may stop at any time. See Miranda v. Arizona, 384 U.S. 436, 444-445 (1966) ("the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use" of these warnings) "If Miranda warnings are not given before a person 'in custody' is questioned, evidence resulting from the questioning must be suppressed." United States v. Jacobs, 431 F.3d 99, 104 (3d Cir. 2005).

### B. Defendant's Statement to Miles

Defendant argues that because his second statement – that the gun belonged to his wife – was made without Miranda warnings during a custodial interrogation, it must be suppressed. I agree.

Miranda warnings are required when a suspect is 1) in custody; and 2) subject to interrogation. See Thompson v. Keohane, 516 U.S. 99, 102 (1995) (internal quotation marks omitted).

> [By] custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

Miranda, 384 U.S. at 444.

The Government concedes, as it must, that once Defendant was handcuffed and secured by armed Marshals in the bathroom of his apartment, he was in custody. *3/11/10 Tr. at 88:20-21; (Doc. No. 43, at 22.)* Defendant was thus "in custody" when he made his second statement. See Jacobs, 431 F.3d at 105 ("[T]here are at least three differently worded tests for when a person is in custody: (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest."); United States v. Santiago, 2008 U.S. Dist. LEXIS 77960, *8 (E.D. Pa. Oct. 3, 2008) ("Although Defendant was not under formal arrest at the time of his statement, he was 'in custody' because he was handcuffed and surrounded by armed officers.").

Conceding that Defendant did not receive Miranda warnings before marking his second statement, the Government nonetheless argues that I should admit the statement because it "was not the product of interrogation, and therefore is admissible." *(Doc. No. 43, at 22.)* I do not agree.

In <u>Rhode Island v. Innis</u>, the Supreme Court held that "interrogation refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." 446 U.S. 291, 301 (1980). Here, Miles' remark, "Dude," was reasonably likely to elicit an incriminating response from Defendant. Indeed, Miles testified that he made the remark to learn from Defendant why he had, moments before, falsely denied that there was a gun in the apartment. <u>*See*</u> *3/11/10 Tr. at 88:3-6.*

I have found that Miles had received no Fifth Amendment training, did not know when he could properly question a supervisee during a home search, and did not seek to "interrogate" Defendant. Miles approached Defendant within moments of entering the apartment with armed Marshals and recovering a gun that Defendant said was not there. In these strained and urgent circumstances, Miles' remark, "Dude," although perhaps understandable, was impermissible. <u>See</u> <u>United States v. Brownlee</u>, 454 F.3d 131, 147 (3d Cir. 2006). I am thus compelled to conclude that Defendant's second statement was the product of custodial interrogation in the absence of <u>Miranda</u> warnings. Accordingly, I must suppress the statement. <u>See</u> <u>Reinert v. Larkins</u>, 379 F.3d 76, 90 (3d Cir. 2004) ("Miranda requires that [an] unwarned [statement] must be suppressed") (internal citations and quotation marks omitted).

## C.  Defendant's Subsequent Statement

Defendant also argues that his third statement -- made during the interview conducted by Carroll and Donnelly -- was impermissibly tainted by his second statement and so must be suppressed. I do not agree.

The Supreme Court has held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to any subsequent admission. Oregon v. Elstad, 470 U.S. 298, 314 (1985). Rather,

> the relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.

Elstad, 470 U.S. at 318.

Elstad applies "unless [government officials] deliberately withheld warnings" before the suspect made his initial statement. United States v. Naranjo, 426 F.3d 221, 232 (3d Cir. 2005); see also United States v. Long Tong Kiam, 432 F.3d 524, 532 (3d Cir. 2006) ("Once we determine that the Miranda violation was not deliberate, we must fall back on Elstad.").

As I have found, in speaking to Defendant in the heated moments immediately after the gun was recovered, Miles -- who had no Fifth Amendment training -- did not intend to interrogate Defendant. He certainly was not seeking to evade Miranda. Accordingly, I will apply Elstad. See Reinert v. Larkins, 379 F.3d 76, 91 (3d Cir. 2004) (Elstad controls where the failure to warn, "though unfortunate and unexplained, seems much more likely to have been a simple failure to administer the warnings rather than an intentional withholding that was part of a larger, nefarious plot").

Carroll and Donnelly properly administered Miranda warnings to Defendant, who understood his rights and chose to waive them. Although Carroll and Donnelly participated in the search of Defendant's residence, they were not present when Defendant made his second

statement, did not know of Miles' remark to Defendant, and did not know that Defendant had responded to the remark. Moreover, contrary to Defendant's argument, he was not subjected to a "single, extended custodial interrogation at the hands of law enforcement." *(Doc. No. 28 at 12.)* After Defendant made his second statement at approximately 6:30 a.m., he was not again questioned until 12:30 p.m. These were thus two entirely separate discussions at different locations some six hours apart. See United States v. Daniel, 932 F.2d 517, 519 (6th Cir. 1991) ("[S]uch factors as intervening time, removal of the prisoner to a different place, and change in identity of interrogators [can] make a second, warned statement voluntary, despite the prior involuntary statement."). Finally, there "is no serious suggestion that *either* confession was involuntary in the sense that it was elicited by threats of violence, deceit, unduly lengthy interrogation or improper promises." United States v. Johnson, 816 F.2d 918, 922 (3d Cir. 1987) (applying the Elstad test) (emphasis added).

In these circumstances – especially in light of the Marshals' "careful and thorough administration of Miranda warnings" – I conclude that Defendant's third statement was voluntary. Reinert, 379 F.3d at 90; see also Larkins, 379 F.3d at 90 ("Absent deliberate coercion or improper tactics in obtaining an unwarned statement, a careful and thorough administration of Miranda warnings cures the condition that rendered the unwarned statement inadmissible."); Johnson, 816 F.2d at 922-923 ("[A] suspect's subsequent choice to waive his or her rights after a proper administration of Miranda warnings should ordinarily suffice to dissipate the coercive impact of the earlier confession and to demonstrate knowledge and voluntariness."). Accordingly, I will not exclude the third statement.

### III. Conclusion

For these reasons, I will **deny** Defendant's Motion to Suppress Physical Evidence, **grant** Defendant's Motion to Suppress Statements as to Defendant's second statement that the seized firearm belonged to his wife, and **deny** Defendant's Motion to Suppress Statements as to the subsequent statement Defendant made to Marshals Carroll and Donnelly.

An appropriate Order follows.


**BY THE COURT.**

*/s/ Paul S. Diamond*
_____
**Paul S. Diamond, J.**