IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | |
| v. | : | Crim. No. 09-568 |
| | : | |
| GREGORY GRISWOLD | : | |
| | : | |

**Diamond, J.**                                                                                                            **December 14, 2011**

## MEMORANDUM

After a four-day trial, the jury convicted Defendant Gregory Griswold of possession of a firearm and ammunition by a convicted felon. 18 U.S.C. § 922(g)(1). I indicated during trial that I would issue this Memorandum, setting forth more fully the bases of several rulings: (1) denial of Defendant's pretrial Motion *In Limine* to exclude two knives and gun periodicals seized from his apartment; (2) denial of Defendant's last-minute request to proceed *pro se*; (3) admission of a recorded telephone conversation between Defendant and Yunina Wingfield; and (4) admission of a newspaper clipping on which Defendant had written a threat to a key Government witness.

I.     BACKGROUND

The trial evidence showed that Defendant, having been convicted in 1994 before the Honorable Harvey Bartle and a jury of firearms offenses, was on supervised release in September 2008 when authorities searched his Philadelphia apartment. I have previously described that search, Defendant's arrest, and his statements to authorities. *(See Memorandum, July 20, 2010, Doc. No. 48 at 1, 8–13 (granting in part and denying in part Defendant's Motion to Suppress).)* Briefly, acting on anonymous tips that Defendant illegally had a handgun,

Defendant's Probation Officer obtained Judge Bartle's authorization to search Defendant's apartment. With the assistance of United States Marshals, the Officer conducted the search and recovered a fully-loaded, semiautomatic handgun, a duffel bag containing ammunition for the gun, a brochure for a local firing range, and gun periodicals. The search team also recovered a folding knife from a closet and a sheathed fixed-blade knife on a table.

Shortly after his arrest, Defendant told the Marshals that the handgun belonged to his wife, Yunina Wingfield. *(Doc. No. 48 at 13.)* Defendant subsequently telephoned Ms. Wingfield from prison and unsuccessfully urged her to tell authorities that the gun was hers. The Government subsequently learned that the "anonymous tipster" was Defendant's former paramour, Tarena Pendleton. Through a series of letters, Defendant also sought unsuccessfully to convince Ms. Pendleton to tell authorities that she had planted the gun in his apartment. The Government introduced the letters—which because increasingly threatening—to show Defendant's consciousness of guilt.

Defendant did not dispute that the gun and ammunition were in his apartment. Rather, he sought to convince the jury that Ms. Pendleton had planted them and then alerted authorities to punish Defendant after their romantic relationship ended. Although Ms. Pendleton acknowledged that she informed authorities of the gun because she was angry at Defendant, she denied planting the weapon. *(Trial Tr., Nov. 3, 2011, Doc. No. 129 at 35:23–37:3.)*

II.     DEFENDANT'S PRETRIAL MOTION IN LIMINE

Defendant asked me to exclude as irrelevant and prejudicial the two knives and gun periodicals recovered from his apartment. *(Am. Mot. in Limine, Doc. No. 96.)* After I heard argument during the Final Pretrial Conference, I indicated that the periodicals were admissible,

but deferred ruling on the knives until I could examine them. *(Hr'g Tr., Oct. 24, 2011, Doc. No. 124 at 6–11.)*

As I explained in denying Defendant's Motion, the periodicals are probative of Defendant's intent and motive to possess a gun. That the periodicals were found in a duffel bag in Defendant's apartment together with ammunition for the gun and a local firing range brochure suggests that Defendant did in fact possess the gun, and refutes Defendant's contention that the weapon was planted. Because the periodicals presented no risk of unfair prejudice, I admitted them, finding that their probative value was not substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403.

I inspected the knives on the second day of trial. Neither knife had a blade longer than four inches; they appeared to be steak knives. There was no suggestion that it was unlawful for Defendant to possess them. *(See Doc. No. 124 at 10:25–11:2.)* Rather, the Government sought to introduce them to corroborate Ms. Pendleton's "anonymous" tip that Defendant carried a knife as well as a gun. In thus bolstering Ms. Pendleton's credibility, this evidence necessarily refuted Defendant's contention that Ms. Pendleton had planted the gun. Having examined the knives, I found that the danger of unfair prejudice was minimal. Accordingly, I admitted the knives because their probative value was not substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403.

III.    DEFENDANT'S MOTION TO PROCEED PRO SE

On the first day of trial—immediately before jury selection—Defendant asked me to dismiss his counsel and announced for the first time that he wished to represent himself, providing I continued trial for two or three months. *(Trial Tr., Oct. 31, 2011, Doc. No. 125 at*

*2:13–15, 12:15–21.*) I refused to continue trial and so denied his request.

### A. *Standards*

The Sixth Amendment guarantees criminal defendants the right to self-representation. Faretta v. California, 422 U.S. 806, 819–20 (1975). A defendant's request to proceed *pro se* is timely even if made on the eve of trial. United States v. Bankoff, 613 F.3d 358, 373 (3d Cir. 2010). The right to self-representation is not absolute, however. Martinez v. Court of Appeal of Cal., 528 U.S. 152, 161 (2000). Nor is it "a license to disrupt the criminal calendar, or a trial in progress." Buhl v. Cooksey, 233 F.3d 783, 797 (3d Cir. 2000) (internal quotations omitted); see also United States v. Kaczynski, 239 F.3d 1108, 1116 (9th Cir. 2001) (upholding denial of self-representation request that was made for purposes of delay); United States v. Akers, 215 F.3d 1089, 1097 (10th Cir. 2000) ("The district court properly denies a request for self-representation where it finds the request was made to delay the trial."); Hamilton v. Groose, 28 F.3d 859, 862 (8th Cir. 1994) ("Defendant may not manipulate this right in order to delay or disrupt his trial.").

When a defendant seeks to proceed *pro se*, the district court must conduct an inquiry to satisfy the following requirements: (1) the defendant must assert his desire to proceed *pro se* clearly and unequivocally; (2) the court must ensure that the defendant understands the nature of the charges, the range of possible punishments, and the specific risks involved in proceeding without counsel; and (3) the defendant is competent to stand trial. United States v. Peppers, 302 F.3d 120, 132 (3d Cir. 2002).

The Third Circuit has addressed how district courts should evaluate eleventh-hour self-representation requests:

> Where, on the eve of trial, a defendant seeks new counsel, or, in the alternative, opts to represent himself, the district court . . . must decide if the reasons for the defendant's request for substitute counsel constitute good cause and are thus sufficiently substantial to justify a continuance of the trial in order to allow new counsel to be obtained. If the district court determines that the defendant is not entitled to a continuance in order to engage new counsel, the defendant is then left with a choice between continuing with his existing counsel or proceeding to trial pro se . . . .

United States v. Welty, 674 F.2d 185, 187 (3d Cir. 1982). The Welty Court thus held that if the defendant cannot establish good cause, then he must proceed with current counsel or represent himself without a continuance. See also Bankoff, 613 F.3d at 373 (request to proceed *pro se* timely, even if made on eve of trial).

B. *Discussion*

I had previously replaced Defendant's counsel—the Federal Defender—because of a conflict: the Defender had represented Ms. Pendleton, perhaps the Government's most important witness. *(Hr'g Tr., Jan. 4, 2011, Doc. No. 105 at 22:17–24:22.)* This replacement resulted in a delay of trial so that new counsel—Giovanni Campbell, whom I appointed on January 4, 2011—could adequately prepare.

Over ten months later—one week before the October 24, 2011 Final Pretrial Conference—Defendant for the first time asked me to replace Mr. Campbell. *(Def.'s Omnibus Pretrial Mot., Doc. No. 108.)* The complaints Defendant raised during the October 24th Conference respecting Mr. Campbell were quite general. I excluded the Government during a portion of the Conference so that Defendant and Mr. Campbell would not disclose prematurely their trial strategy. Defendant then testified that Mr. Campbell had not met or spoken with him with sufficient frequency:

>THE DEFENDANT: Well, [Mr. Campbell and I] haven't even discussed certain things.
>THE COURT: Like what?
>THE DEFENDANT: I mean, things that have happened in my case.
>THE COURT: Like what?
>THE DEFENDANT: Like what?
>THE COURT: Yeah, like what?
>THE DEFENDANT: Like the case—like the case in general.

*(Hr'g Tr., Oct. 24, 2011, Doc. No. 123 at 3:25–4:11.)*

When Defendant also complained that Mr. Campbell had not contacted helpful witnesses:

>THE COURT: Like who? Who?
>THE DEFENDANT: Who? What you mean, who? I mean, it's people—
>THE COURT: Sir—
>. . .
>THE DEFENDANT: I got a lot of witnesses.

*(Id. at 4:17–25.)* Only when I pressed him did Defendant name two potential witnesses that Mr. Campbell would not call. *(Id. at 5:17–6:18.)*

I discredited Defendant's suggestion that Mr. Campbell had not visited or spoken with Defendant with sufficient frequency and had not adequately prepared for trial. *(Doc. No. 123 at 3:19–7:14.)* Mr. Campbell, an extremely capable, experienced lawyer, credibly explained his trial preparation, including the use of an investigator and a potential expert witness. *(Id. at 2:4–3:12; See also Doc. Nos. 90, 100, 104 (authorizing defense counsel's requests for expenditures for investigator, expert, and consultant services).)* I rejected Defendant's complaint respecting Mr. Campbell's refusal to call two witnesses after Mr. Campbell explained (without the Government present) the strategic basis for that decision. *(Doc. No. 123 at 2:4–16, 6:19–24, 7:17–8:11.)*

It was obvious that Defendant's amorphous complaints and belated request to replace Mr.

Campbell were intended to delay and disrupt the proceedings. *(Doc. No. 124 at 4:19–5:6.)* See Welty, 674 F.2d at 187 (defendant requesting new counsel on eve of trial must show good cause), accord Pazden v. Maurer, 424 F.3d 303, 314 n.11 (3d Cir. 2005). Accordingly, I refused to replace Mr. Campbell because Defendant had failed to establish good cause. Defendant did not at that time ask to represent himself. Rather, he made that request a week later, when jury selection was about to begin. *(Doc. No. 125 at 2:13–3:2.)*

Once Defendant made his request, I conducted the required Peppers inquiry. See Peppers, 302 F.3d at 132–33. When I asked Defendant if he was prepared to proceed *pro se*, he responded that he was not: "I would need a continuance. . . . [A] couple months, three months." *(Doc. No. 125 at 12:17–20.)* He repeated his discredited complaints respecting Mr. Campbell. Yet, when I asked him why he waited so long to seek to proceed *pro se*, Defendant stated, in effect, that until the first day of trial, he was satisfied with Mr. Campbell's representation. *(Id. at 10:25–11:1 ("I was under the impression that Mr. Campbell had my best interests at hand.").)* This was painfully incredible: as I have discussed, in the preceding weeks Defendant had complained about Mr. Campbell and asked me to replace him.

It was thus apparent that, like his earlier request to replace Mr. Campbell, Defendant's oral Motion was made in bad faith and intended to disrupt and delay the proceedings. I thus concluded that Defendant had not established good cause and denied his request to dismiss his counsel and represent himself. *(Id. at 13:6–7.)* See Peppers, 203 F.3d at 132 (defendant making time-sensitive request to represent himself must demonstrate good cause to secure continuance) (citing Welty, 674 F.2d at 187).

IV. RECORDED TELEPHONE CONVERSATIONS BETWEEN YUNINA WINGFIELD AND DEFENDANT WHILE HE WAS INCARCERATED

The Government offered into evidence a recorded telephone conversation between Defendant and Yunina Wingfield. *(Doc. No. 129 at 23:15–24:25.)* The Parties stipulated that Defendant initiated the call from the Philadelphia Federal Detention Center, that FDC inmates are aware both that their telephone calls are subject to recording by the Bureau of Prisons and that the Bureau would make the recordings available to law enforcement. *(Stipulation, Doc. No. 127.)*

Defendant argued that because he and Ms. Wingfield were married, the spousal communications privilege precluded the admission of the audio recording *(Trial Tr., Nov. 1, 2011, Doc. No. 128 at 4:8–23)*; I rejected his argument and admitted the recording.

    A.    *Standards*

Communications between spouses made in confidence and intended to be confidential are privileged. United States v. Ammar, 714 F.2d 238, 258 (3d Cir. 1983). I found that the prison recording was not subject to the spousal communications privilege because: (1) Defendant and Ms. Wingfield were not married under governing law; and (2) the communication was not made in confidence.

Whether Defendant and Ms. Wingfield were married is a question of Pennsylvania law. See 25 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5573 (citing United States v. Bad Wound, 203 F.3d 1072, 1075 n.1 (8th Cir. 2000); United States v. Knox, 124 F.3d 1360, 1365 (10th Cir. 1997)). In Pennsylvania, the test of a valid marriage is not the couple's belief or behavior respecting their purported marriage, but "whether in law [the couple

is] lawfully married." Commonwealth v. Clanton, 151 A.2d 88, 92 (Pa. 1959); Commonwealth v. Valle-Vélez, 995 A.2d 1264, 1268–69 (Pa. Super. Ct. 2010). To marry in Pennsylvania, a couple must obtain a license before the wedding ceremony and must return an executed marriage certificate to the issuing court within ten days of the ceremony. 23 Pa. Cons. Stat. Ann. §§ 1301, 1504. Bigamy is illegal in Pennsylvania. 18 Pa. Cons. Stat. Ann. § 4301.

B.   *Discussion*

Defendant and Ms. Wingfield maintained separate residences. Ms. Wingfield would visit Defendant only at his apartment and only upon his invitation. *(Doc. No. 129 at 44:2–4.)* Although Defendant claimed he and Ms. Wingfield were married in an Islamic ceremony in his Philadelphia temple, he produced neither a certificate nor any document of marriage that he returned to the Philadelphia Common Pleas Court. Ms. Wingfield acknowledged that she was not legally married to Defendant. *(Id. at 16:11–15.)* Moreover, it was undisputed that male members of Defendant's temple were permitted to have multiple wives, and that Defendant considered marrying a second wife—Tarena Pendleton. *(Id. at 61:22–25.)*

In these circumstances, Defendant did not establish a valid marriage to Ms. Wingfield under Pennsylvania law. Accordingly, his communications with her were not privileged.

Even if the spousal privilege somehow obtained, Defendant waived that privilege. He was aware that his telephone calls from the FDC would be monitored, recorded, and made available to the prosecution. *(Doc. No. 127.)* The recorded communications thus were not made in confidence. See United States v. Barlow, 307 F. App'x 678, 681 (3d Cir. 2009) (incarcerated defendant's phone conversations with his wife were not privileged). Cf. United States v. Hill, 967 F.2d 902, 911 n.12 (3d Cir. 1992) (known presence of third party renders communication

non-confidential).

Accordingly, I admitted this recording.

V.     NEWSPAPER CLIPPING WITH DEFENDANT'S HANDWRITTEN THREAT

Toward the end of her relationship with Defendant, Ms. Pendleton provided the anonymous tips to the Government that led to Defendant's arrest in this matter. She testified at trial that she repeatedly saw Defendant with the handgun found in his apartment. *(Doc. No. 129 at 65:13–69:24.)* Defendant argued to the jury that after he refused to make Ms. Pendleton his second "wife," she had both the motive (anger) to cause his conviction by lying about his possession of the gun, and the means (her visits to his apartment) to plant the weapon.

The Government presented a series of letters from Defendant to Ms. Pendleton—increasingly threatening in tone—through which Defendant sought to convince her to tell Judge Bartle and other authorities: 1) that she had lied about seeing Defendant with the gun, and 2) that she had planted the gun. The letters included detailed instructions as to how Ms. Pendleton was to recant her version of events and how she planted the weapon. *(Trial Tr., Nov. 3, 2011, Doc. No. 130 at 11:24–14:22, 16:3–13.)* Defendant sent most of these letters from the FDC. In the final handwritten letter, Defendant told Ms. Pendleton she was "an accident waiting to happen," and, "If you live to be forty, this will be a great accomplishment." *(Doc. No. 129 at 95:1–2.)* Defendant enclosed with that letter a newspaper clipping about a Germantown woman whose boyfriend had stabbed her to death. On the back of the clipping, Defendant wrote, "I know her, sad situation." *(Gov.'s Mot. in Limine, Doc. No. 93 at 5; Doc. No. 129 at 99:24–100:7.)*

Defendant objected to the admission of both the article and the handwritten note, arguing that they suggested that Defendant had murdered the Germantown woman. Defendant thus

contended that the clipping was improper character evidence under Fed. R. Evid. 404(b), and that its probative value was substantially outweighed by the risk of unfair prejudice under Rule 403. *(Doc. No. 129 at 96:18–97:14.)*

"It is well-established that evidence of threats or intimidation is admissible under Rule 404(b) to show a defendant's consciousness of guilt." <u>United States v. Gatto</u>, 995 F.2d 449, 454 (3d Cir. 1993). In applying Rule 403 to threat evidence, the court must consider the need for the evidence, informed by (1) the "importance and centrality to the ultimate issue," and (2) "the availability of other evidence to establish the fact sought to be proven by use of the threat evidence." <u>United States v. Guerrero</u>, 803 F.2d 783, 786 (1986). The court must also consider the danger of unfair prejudice, informed by (1) the "tendency of the particular conduct alleged to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"; (2) "the nature or style of the specific witness's narrative"; (3) "the likelihood that the testimony is true"; (4) "the sufficiency of the other evidence presented to make a reasonable connection between the defendant and the offense charged"; and (5) "the extent to which any possible inflaming of the jury can be cured by limiting instructions." <u>Id.</u> (internal quotations omitted).

The letter, clipping, and note had substantial probative value, demonstrating Defendant's consciousness of guilt. The threat evidence thus related directly to the central issue of whether Defendant possessed the gun found in his residence. It strongly corroborated Ms. Pendleton's testimony that she did not plant the weapon. Moreover, the article describes a murder that occurred in September of 2010, while Defendant was detained pending trial in this matter, and indicates that the woman's boyfriend (not Defendant) murdered her. The evidence thus has little tendency to suggest a decision on an improper basis. The manner of its introduction was neither inflammatory nor provocative. The "truth" of the threat was not impugned, as Defendant did not

dispute the letter's authenticity.

I concluded thus that it would be reasonable for the jury to infer that the letter, clipping, and note were intended to convey Defendant's threat that he would kill Ms. Pendleton if she did not change her version of events. The minimal danger of unfair prejudice created by the evidence did not substantially outweigh the significant probative value. <u>See</u> Fed. R. Evid. 403, 404(b).

Finally, the Government provided to Defendant the required pretrial notice of its intention to use the newspaper, clipping, and note. <u>See</u> Fed. R. Evid. 404(b). In its August 5, 2011 Motion to Admit Spoliation Evidence, the Government described Defendant's letters to Ms. Pendleton and the enclosed newspaper clipping and note. *(Doc. No. 93 at 5.)* At the Final Pretrial Conference, Defendant stated that he did not oppose this Motion *(Doc. No. 124 at 6:13–22)*, so I denied it as moot *(<u>Id.</u>; Order, Oct. 27, 2011, Doc. No. 114 at 2)*.

In sum, by the time of trial, Defendant changed the position he took at the Final Pretrial Conference and objected to the admission of the clipping and note. Assuming Defendant did not waive his objection, I overruled it, concluding that the evidence was admissible under Rules 403 and 404(b).

**AND IT IS SO ORDERED.**

/s/ Paul S. Diamond
_____
Paul S. Diamond, J.